DISSENTING OPINION BY
JUDGE McCullough
The Environmental Hearing Board’s (Board) grant of a rebuttable evidentiary presumption to Kiskadden established that the chemicals found in his well water were contained in products used at the ‘Yeager Site.” 'Because the Board did not find that this presumption was rebutted, I must respectfully dissent from the thoughtful and well-written Majority,
Loren Kiskadden (Kiskadden) owns residential property and his well water became contaminated. At the same time, Range Resources-Appalachia, LLC (Range) was performing oil and gas drilling operations at the ‘Yeager Site,” which is located approximately a half of a mile away. Perhaps significantly, the Yeager Site is situated on a hilltop and the Kis-kadden property is situated down below, in á valley. The Yeager Site has a prolific *404 history of numerous leaks and spills—at least eighteen that we know of. (Findings of Fact at Nos. 45-64; Adjudication at 3-4.) Kiskadden filed a complaint with the Department of Environmental Protection (Department), and water quality testing was conducted by the parties and the Department.
Eventually, the Department denied Kis-kadden relief. Although the Department concluded that Kiskadden’s well water was contaminated, the Department determihed that the pollutants in the water supply did not originate from the Yeager Site. Kis-kadden then appealed to the Board, and after Range failed to respond to a discovery request, the Board granted Kiskadden a rebuttable evidentiary presumption. (Adjudication at 4-5.)
Specifically, this presumption “eliminated [Kiskadden’s] need to prove that chemicals found in his well water were contained in products used at the Yeager Site.” (Adjudication at 6.) Stated differently, the Board presumed that the chemicals discovered in Kiskadden’s well water were present at the Yeager Site, the origin of the contamination. Without doubt, this is a remarkable presumption that is extremely damaging to Range, having the practical effect of assuming that, in terms of contaminants, those found at the Yeager Site were the same as those in the well water. It is also a presumption that was never found to have been rebutted by the Board. Nevertheless, the Board concluded that Kiskadden failed to establish that a hydro-geological connection existed between the well and the Yeager Site, i.e., that the chemicals traveled from the Yeager Site to the well.
During the hearing before the Board, Kiskadden adduced volumes of empirical data showing a highly positive (if not nearly perfect) correlation between the constituents found at the original place of the contamination, the Yeager Site, and the contamination at the well. By no means an exhaustive list, the following elements and/or compounds—sometimes called “parameters”—were located at both the Yeager Site and in the well water: iron, chloride, sulfate, strontium, magnesium, methane, ethane, aluminum, barium, sodium, manganese, cobalt, chromium, copper, silicon, lithium, tin, vanadium, zinc, boron, titanium, oil and grease, ethyl benzene, propane, o-exylene, m-exylene, p-exylene, sulfur, uranium, toluene, acetone, and ax--senic. {See Kiskadden’s brief at Appendix A-C.) The Board found, as a matter of fact, that “[a] number of constituents found in sampling at the Yeager Site were also present in [Kiskadden’s] water.” (Findings of Fact at No. 94.) As Kiskad-den observes in his brief, “the parameters detected in the soil samples [of the Yeager Site] mirror the parameters detected in [Kiskadden’s] water in almost every instance, including detections of both heavy metals and volatile organic compounds.” (Kiskadden’s brief at 26; see Reproduced Record (R.R.) at 1103a-05a.)
The Department’s witnesses, Michael Morgart, a geology and hydrogeology expert, and Alan Eichler, an expert on water investigations and isotopic gas evaluations, both testified that a hydrogeological connection .can be established if a contaminant found at Point A (the Yeager Site) is discovered at Point B (the well).
Morgart testified:
I would think [this] would be a great way of showing that there was a connection if you had maybe not just one chemical parameter but a whole host of parameters and they showed up in the same—probably not the same concentrations because of the dilution rates that we talked about but also everything that was spilled, let’s say, should travel through the same pathway. That would *405 be a great indicator that there was a connection.
* * *
Q.... Do there exist any definitive tests that you know, as a professional geologist, that would enable you to definitively say this is where the fluid went in this particular area given the geology? ... A_[T]he tests would be quality related, if you had a sample from point A and the same fluid comes out at point B, that would indicate that a lot of parameters from, the spill discharge,, whatever you want to call it, at point A, came to point B, not just selective ones showed up there.
(R.R. at 631a-32a.)
Eichler testified:
Q. And so, would it ever -... be important information that you have a potential site of a leak, if the same chemicals were at that leak and you then later find them in a complainant’s water source, is that an important piece of information in contaminant transport and groundwater flow and pathways?
A. Oh, it is extremely important.
Q. Why is that?
* * *
A. [If] you have a contaminant that, you know, is known from a certain source area, [and] comes out another location, especially one type of parameter that isn’t naturally occurring or isn’t found in that particular environment or sometimes that maybe it is ... then yes. It is always best to . look at more than one parameter. To hang your hat on one parameter when there are multiple ones out there, it just doesn’t utilize all your data wisely.
(R.R. at 947a-48a.)
Given Kiskadden’s empirical data and the testimony of Morgart and Eichler, Kis-kadden adduced sufficient evidence to establish a hydrogeological connection between the Yeager Site and the well. The unrebutted presumption that the chemicals found in Kiskadden’s well water were present at the Yeager Site solidifies the fact that Kiskadden met his burden of proof. When considered ■ in tandem, the presumption, Kiskadden’s empirical data, and other evidence conjoin to constitute conclusive evidence that there was a hy-drogeological connection. - Indeed, the Board found that Kiskadden’s water exhibits high levels of sodium and total dissolved solids, which was .typical of water chemistry in gás well operations. (Findings of Fact at Nos. 97-98.)
; Despite all this proof, the Board found that “[a] number of the constituents found in [Kiskadden’s] water can be naturally occurring” and faulted Kiskadden’s empirical data because the- well water did not exhibit a high level of chlorides. (Findings of Fact at Nos. 95-98.) The Board concluded:
[Kiskadden] produced hundreds of pages of sampling results showing that numerous parameters had been detected in [the well water] that were also detected in sampling at the Yeager site. The problem is that most of those parameters can also be found naturally in groundwater. Thus, their mere detection in a sample is not enough to prove a hydrogeologic connection. Those that are riot found naturally in groundwater are also associated with products and activities, unrelated to hydraulic fracturing operations.
(Adjudication at 47) (emphasis added).
In my view, the Board’s reasoning is at odds with the presumption that the chemicals found in Kiskadden’s well water were present at the Yeager Site. Importantly, the Board never determined that the presumption was rebutted by affirmative evi *406 dence to the contrary. In essence, the Board basically reversed the presumption it granted to Kiskadden against Kiskad-den, by hypothesizing that the parameters “could have” come from somewhere -else, when it should have presumed that they came from the Yeager Site. Ignoring Kis-kadden’s empirical data and the effect of the presumption, the Board dismissed Kis-kadden’s case and the highly positive correlation between the well water and the Yeager Site as mere happenstance, coincidence, or fortuity. Because the Board failed to properly apply the presumption in the context of this case, and, for all intents and purposes, never provided. Kiskadden with the benefit of that presumption, I would vacate and remand to the Board to rectify this legal error with the appropriate findings of fact and analysis.
Accordingly, I respectfully dissent.